Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| BRENDA LIZ ROSA; DAMARIS CARRILLO ARCE; ISABEL MONTES; ANGELINA OSORIO; JOHANNA PÉREZ WILLIAMS;  Apelantes  v.  GVS PUERTO RICO LLC, COMPANY  Apelado | KLAN202500488 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo  Caso Núm.: FA2023CV00743 (301)  Sobre: Procedimiento Sumario (Ley 2 de 1961); Despido Injustificado (Ley 80 de 1976); Ley de Transformación y Flexibilidad Laboral (Ley 4 de 2017); Daños y Discrimen (Ley 100 de 1959) |
|---|---|---|

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Álvarez Esnard y la jueza Prats Palerm.

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 23 de septiembre de 2025.

Comparece ante nos Brenda Liz Rosa, Damaris Carrillo Arce, Isabel Montes, Angelina Osorio y Johanna Pérez Williams (en conjunto, "las Apelantes") mediante *Apelación* presentada el 29 de mayo de 2025. Nos solicita la revocación de la *Sentencia* emitida el 12 de mayo de 2025, notificada el 19 de mayo del mismo año por el Tribunal de Primera Instancia, Sala Superior de Fajardo ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el foro primario declaró *Ha Lugar* la *Moción de Sentencia Sumaria* instada por GVS Puerto Rico LLC, Company ("GVS" o "Apelada") y, en consecuencia, desestimó con perjuicio la reclamación instada por las Apelantes.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

Número Identificador

SEN(RES)2025_____

**I.**

El 6 de septiembre de 2023, las Apelantes instaron *Querella* sobre despido injustificado al amparo de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley Sobre Despidos Injustificados*, 29 LPRA sec. 185a *et seq.* ("Ley Núm. 80"), en el caso FA2023CV00743.[1] Asimismo, las Apelantes se acogieron al procedimiento establecido en la *Ley de Procedimiento Sumario de Reclamaciones Laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada ("Ley Núm. 2"), 32 LPRA sec. 3118 *et seq.* Mediante esta, las Apelantes argumentaron que eran empleadas de GVS, y se desempeñaron en varias posiciones en la empresa. Adujeron que, las Apelantes fueron despedidas el 31 de enero de 2023. Asimismo, argumentaron que, al momento de sus respectivos despidos, éstas eran las empleadas de mayor antigüedad en las clasificaciones ocupacionales de las diferentes plazas que ocupaban. Adujeron que, GVS continuó sus operaciones luego de haberlas despido y que otros empleados más jóvenes ocuparon las plazas que éstas ostentaban.

Cónsono con lo anterior, esgrimieron que, el 16 de marzo de 2023, , a través de la compañía Kelly Services Inc. ("Kelly"), se le ofreció a las Apelantes las plazas que estas ocupaban al momento de su despido. Adujeron que ello, tendría la consecuencia de que estas empezarían como empleadas nuevas, a través de una agencia de empleo y bajo las disposiciones de la "reforma laboral del 2017". En otras palabras, con un salario y beneficios diferentes. Ante este cuadro, las Apelantes expusieron que fueron despedidas sin justa causa pues GVS violentó una orden de retención reconocida en la Ley Núm. 80, *supra*.

---

[1] Véase, Apéndice del Recurso, págs. 18-25.

Por todo lo anterior, cada una de las Apelantes solicitó una indemnización de ochenta mil dólares ($80,000.00) por daños económicos, salarios dejados de devengar, así como aquellos salarios por devengarse. A su vez, cada una de las Apelantes solicitó una indemnización de cien mil dólares ($100,000.00) por concepto de sufrimientos y angustias mentales, el pago de la mesada, la reinstalación a sus respectivas posiciones y el pago de todos los gastos, costas, y honorarios de abogado.

Por su parte, el 18 de septiembre de 2023, GVS presentó *Contestación a Querella*.[2] Mediante esta, negó ciertas alegaciones y levantó sus correspondientes defensas afirmativas. Posteriormente, el 11 de marzo de 2024, la Apelada presentó *Moción Informativa Sobre Solicitud de Consolidación de Casos*.[3] Mediante este escrito, sostuvo que la causa de acción presentada por las Apelantes contenía alegaciones y controversias idénticas a las instadas en el caso de *Edwin Concepción Torres y otros v. GVS Puerto Rico LLC*, alfanumérico FA2024CV00069, por lo cual, solicitó la consolidación de ambos pleitos. Así pues, el 11 de marzo de 2024, el foro primario emitió *Orden de Consolidación* y, consecuentemente consolidó los casos FA2023CV00743 y el FA2024CV00069.[4]

Tras varios asuntos procesales, el 2 de diciembre de 2024, GVS presentó *Moción de Sentencia Sumaria con Relación al Caso Edwin Concepción y Otros V. GVS Puerto Rico LLC, FA202023CV00743*.[5] En esencia, solicitó que se dictara sentencia por la vía sumaria y se desestimara con perjuicio la totalidad de la reclamación instada por las Apelantes, ya que las aludidas

---

[2] *Íd.*, págs. 26-36.
[3] Véase, SUMAC TPI, Caso FA2023CV00743, Entrada 24.
[4] Véase, Apéndice SUMAC TPI, Caso FA2023CV00743, Entrada 25.
[5] Véase, Apéndice del Recurso, págs. 37-67.

cesantías ocurrieron como consecuencia de una reorganización empresarial legítima y necesaria para atender las dificultades económicas que atravesaba la empresa. En concreto, esbozó que, debido a esta situación financiera, el 25 de enero de 2023, GVS informó a sus empleados que se implementaría un plan de reorganización efectivo el 1 de febrero de 2023. Entre lo propuesto en el aludido plan, se determinó eliminar el segundo turno, entiéndase el horario de 2:30 pm a 11:30 pm,. Así pues, adujo que el 31 de enero de 2023, se entregó a ciertos empleados, una carta intitulada *Notificación de Separación* mediante la cual se le notificaba su despido.

De igual forma, GVS argumentó en su escrito que, como resultado de la reorganización y reducción de personal de la compañía, se despidieron a treinta y siete (37) empleados, efectivo el 31 de enero de 2023. En vista de ello, concluyó la empresa que la única razón para el despido de las Apelantes responde a la reorganización *bona fide* de GVS, lo cual conllevó una reducción de personal.

Por su parte, el 15 de enero de 2025, las Apelantes radicaron *Oposición a Moción de Sentencia Sumaria y Solicitud de Sentencia Sumaria de las Querellantes relacionadas a sus Causas de acción bajo la Reforma Laboral del 2017.*[6] En esta, sostuvieron que existían varios hechos materiales en controversia, los cuales impedían la resolución sumaria del presente pleito. Especificaron que era un hecho en controversia, la alegada reorganización de la empresa, pues GVS nunca presentó prueba que demostrara situación de dificultad económica. De igual forma, aludieron como hecho en controversia, cuál era la posición que ocupaban las Apelantes al momento del despido de acuerdo con los deberes y las funciones que realizaban y el hecho de que otros empleados de

---

[6] *Íd.*, págs. 326- 350.

menor antigüedad continuaron trabajando luego de éstas haber sido despedidas. Arguyeron como hecho controvertido si la Apelada dentro del término de cuarenta y cinco (45) días posteriores a la cesantía, le ofreció a las Apelantes "las mismas plazas que esas ocupaban o no, sin embargo como empleadas nuevas, contratadas bajo la reforma laboral del 2017, con menos beneficios relacionados a licencias de vacacione y enfermedad".[7] A su vez, argumentaron que GVS violentó el Artículo 3.18 de la *Ley de Transformación y Flexibilidad Laboral*, Ley Núm. 4-2017, 29 LPRA sec. 121 *et seq*, la cual enmendó el inciso (b) del Artículo 3 de la *Ley de Vacaciones y Licencia por Enfermedad de Puerto Rico*, Ley Núm. 180-1998, según enmendada, 29 LPRA sec. 250c.[8] Sostuvieron que dicha violación respondía al hecho de haber despedido a las Apelantes y posteriormente, a través de Kelly, volverlas a contratar. Por tal motivo, las Apelantes solicitaron al foro primario que declarara *Ha Lugar* la mencionada causa de acción al amparo de la Ley Núm. 4-2017, *supra*, y Ley Núm. 180-1998, *supra*.

De otro lado, el 21 de enero de 2025, GVS presentó *Moción en torno a Hechos Propuestos por las Querellantes en su Oposición a Moción de Sentencia Sumaria*.[9] En esta, sostuvo que las Apelantes no propusieron ningún hecho de conformidad con la Regla 36.3 (b) de Procedimiento Civil, 32 LPRA Ap. V R. 36.3, por lo cual, se debía concluir que las mismas se dieron por no puestas pues no se logró demostrar controversias de hechos en el presente caso.

Tras evaluar los escritos ante su consideración, el 12 de mayo de 2025, notificada el 19 de mayo del mismo año, el foro *a*

---

[7] *Íd.*, pág. 328.
[8] Si bien en su escrito las Apelantes hicieron alusión al Artículo 5 de la Ley Núm. 180-1998, *supra*, al examinar el texto citado realmente las Apelantes estaban haciendo referencia al Artículo 3 (b) de la referida ley.
[9] Véase, Apéndice del Recurso, págs. 425-450.

*quo* emitió *Sentencia.*[10] Por virtud de esta, el foro primario formuló las siguientes determinaciones de hechos:

## DETERMINACIONES DE HECHOS

1. GVS comenzó operaciones en Puerto Rico en julio de 2020, al adquirir la planta de Haemonetics.

2. Previo a Haemonetics operó la planta de Fajardo, desde en o alrededor de agosto de 2012 hasta julio de 2020.

3. Previo a Haemonetics, Pall operó la planta de Fajardo hasta en o alrededor de julio de 2012.

4. Al adquirir la planta de Fajardo, GVS también se dedicó a la manufactura de filtros, incluyendo filtros de sangre.

5. Las operaciones de la planta de GVS, en Fajardo, Puerto Rico, se divide entre las siguientes áreas: Manufactura, Calidad ("Quality Assurance"), Producción, Supply Chain, Ingeniería y Mantenimiento y Recursos Humanos.

6. El Departamento de Manufactura de GVS tiene varias líneas de producción con distintos productos: Leuko, No Leuko y GPT.

7. Los filtros manufacturados en la línea Leuko tienen un mayor margen de ganancias que los filtros preparados en la línea No Leuko.

8. Posterior al 31 de enero de 2023, GVS tenía más líneas de Leuko operando que de las líneas No Leuko, ya que había más demanda de los filtros manufacturados en la línea de Leuko.

9. La línea de GPT es crítica para el negocio, ya que se manufactura la membrana que se utiliza para poder manufacturar filtros de GVS.

10. Previo al 31 de enero de 2023, el área de Manufactura de GVS operaba en dos turnos: el Primer Turno de 6:00 a.m. a 2:30 p.m. y el Segundo Turno de 2:30 p.m. a 11:30 p.m. En ese momento, Ana María Ramos era la supervisora del Primer Turno, Arlene Vega era la supervisora del Segundo Turno y Mauricio Fernández era el Gerente del área de Manufactura.

11. Previo al 31 de enero de 2023, GVS tomó varias medidas para reducir sus costos, entre ellas canceló actividades para los empleados, eliminó el tercer turno y enviaba a empleados a la casa por *"Lack of Work"* y canceló los contratos de empleados temporeros incluyendo los del puesto de Assembler.

12. Durante el 2022 y principios del 2023, GVS determinó que tenía que reducir los gastos y procedió a eliminar varios puestos que no eran necesarios a la luz de la necesidad operacional.

13. Según surge de los Financial Reports de GVS, la Compañía experimentó pérdidas económicas en el 2022 de sobre $5,000,000 y en 2023 de cerca de $4,000,000.00. Para el 2024, GVS proyectó tener pérdidas económicas de en o alrededor de $1,000,000.00.

14. Una de las razones primordiales que ocasionó pérdidas en GVS es que las órdenes que recibía la Compañía redujeron sustancialmente, de entre 900,000 filtros al

---

[10] *Íd.*, págs. 1-17.

mes para el 2021 al 2022, debido a una acumulación de órdenes, a 500,000 filtros al mes.

15. A partir del 2021 al presente, el aumento en los gastos operacionales y costos de producción redujeron el margen de ganancias de GVS e incluso ocasionaron pérdidas para GVS. Entre los gastos que aumentaron se encuentran los gastos de personal y salario de los empleados; gastos de materia prima; los gastos de empaque del producto para su venta, incluyendo bolsas, cartón y paletas; los gastos de los equipos de protección de los empleados en el área de manufactura; los gastos de transportación de los filtros; y los gastos de electricidad y del generador de la planta.

16. El 25 de enero de 2023, GVS informó a sus empleados que efectivo el 1 de febrero de 2023 eliminaría el Segundo Turno y que empleados del primero y segundo turno se verían impactados.

17. El memorando fechado del 25 de enero de 2023 dirigido a todos los empleados de GVS indica lo siguiente:



**A:**  Todos los Empleados de GVS

**De:**  Recursos Humanos

**Fecha:** 25 de enero de 2023

**Asunto:**  Cancelación del Segundo (2do) Turno de Manufactura GVS Puerto Rico

Algunos negocios y familias han enfrentado situaciones difíciles en estos últimos años. Sin embargo, GVS se ha mantenido implementando y buscando alternativas para continuar siendo competitivos en el mercado durante estos tiempos. A pesar de todos los esfuerzos realizados, lamentablemente hemos tenido que llegar a la determinación de implementar un proceso de reorganización el cual incluye cancelar el segundo (2do) turno a partir del **miércoles, 1ro de febrero del corriente año, entre otras medidas. Empleados del 1er y 2do turno se verán impactados con esta restructuración.** En los próximos días estaremos orientando e impartiendo instrucciones especificas a todo aquel empleado que se vea impactado.

Tanto nuestra gerencia corporativa como local continúa trabajando estrategias para mantener corriendo el negocio de manera rentable. De igual manera confiamos que continuarán cumpliendo con la asistencia diaria, flexibilidad en las tareas asignadas y la mejor actitud de trabajo en equipo para mantener nuestras operaciones corriendo con la máxima eficiencia que GVS Puerto Rico necesita.

18. El 31 de enero de 2023, GVS le entregó una carta titulada "Notificación de Separación", a todos los empleados que iban a ser despedidos como parte de su reorganización.

19. La Notificación de Separación entregada por GVS establece lo siguiente:



**Notificación de Separación**

31 de enero de 2023

Estimado empleado,

Según les hemos informado, GVS Puerto Rico tomó la decisión de llevar a cabo una reorganización debido a una reducción actual y/o anticipada en el volumen de producción, ventas y ganancias, con el propósito de mantenernos competitivos.

Es por esta razón que muy respetuosamente le informamos que a partir del martes 31 de enero de 2023, su posición quedará eliminada y se dará por terminado su empleo con GVS.

Usted recibirá todos los salarios de nómina acumulados, incluyendo cualquier balance de licencia por vacaciones no utilizado por medio de depósito directo a su cuenta habitual.  De igual forma, estará recibiendo documentación de cubierta médica y dental conforme con los requisitos de continuidad bajo el plan de COBRA.

Agradecemos el servicio prestado durante todos estos años y le deseamos mucho éxito en sus futuros proyectos.

Puede contactarse con el Departamento de Recursos Humanos de tener alguna duda y/o pregunta.

20. Treinta y siente (37) empleados fueron despedidos de la Compañía efectivo el 31 de enero de 2023.

21. Entre los treinta y siete (37) empleados despedidos, GVS despidió a Assemblers, un QA Incoming Inspector, una Product Release Coordinator, entre otros.

22. En el caso de los Assemblers, GVS despidió a los empleados de dieciséis (16) años de antigüedad o menos que estaban trabajando en la planta para el 31 de enero de 2023.

23. En el caso de los Assemblers con diecisiete (17) años de antigüedad, además de considerar la antigüedad de los empleados, GVS consideró en qué línea estaban trabajando los empleados en el último año, es decir entre el 2022 al 2023. Considerando los siguientes criterios en cuanto a las líneas de manufactura, y la necesidad operacional en ese momento, GVS procedió con los despidos el 31 de enero de 2023 como sigue:

   a. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban en la línea de GPT no fueron despedidos.

   b. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban únicamente en línea de Leuko y tenían la menor cantidad de acciones disciplinarias no fueron despedidos. A esos efectos, los Assemblers de diecisiete (17) años de antigüedad que operaban únicamente la línea Leuko, tenían la siguiente cantidad de acciones disciplinarias:

      i.   Ángel Flores – 7
      ii.  Lisandra Rivera – 8
      iii. Nilda Rodríguez – 4
      iv.  Luz Matta – 1

   c. Los Assemblers con diecisiete (17) años de antigüedad que únicamente trabajaban en la línea No Leuko fueron despedidos.

   d. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban tanto en la línea Leuko como en la línea No Leuko fueron despedidos.

24. Los Assemblers con diecisiete (17) años de antigüedad que hubiesen participado en algún proyecto y/o tarea especial necesaria para la operación no fueron despedidos. Dichos Assembers son:

   a. Marilym Rodríguez – participó de un proyecto especial con relación al sistema de SAP y de data entry.

   b. Tania Penaloza – participó de un proyecto especial con relación al sistema de SAP y de data entry.

   c. Migdalia Resto – participó de un proyecto especial con relación al área de ingeniería.

   d. Yesenia Oyola – participó de una tarea especial con la inspección de materiales en la Compañía.

25. En cuanto al puesto de Product Release Coordinator, además de Pérez, Nancy Crespo Dones ("Crespo") era la otra persona que ocupaba dicho puesto desde el 16 de marzo de 2015. Crespo tenía una sola acción disciplinaria, mientras que Pérez tenía cinco (5) acciones disciplinarias en su expediente de personal.

26. En cuanto al puesto de QA Incoming Inspector, Luis E. Irizarry Suárez ("Irizarry") y Concepción eran las únicas personas ocupando dicho puesto al 31 de enero de 2023. Irizarry tenía treinta (30) años de antigüedad en la Compañía, mientras que Concepción tenía once (11) años de antigüedad.

27. Dentro de los seis (6) meses después del 31 de enero de 2023, GVS no contrató empleado regular alguno en el puesto de Assembler, Product Release Coordinator o QA Incoming Inspector ni ha tenido vacantes como empleado regular disponibles para dichos puestos.

28. Para el 31 de enero de 2023, GVS tenía alrededor de diez (10) a once (11) líneas de la Leuko operando, pero luego redujo sus operaciones a siete (7) líneas debido a la baja demanda.

29. Al puesto de Assembler también se le conocía como Operator, Operador, Operario y Ensambladora.

30. Un Assembler podían trabajar en la línea Leuko, No-Leuko SQ-40 o GPT.

31. El *job description* del puesto de Assembler indica lo siguiente:



Brenda Rosa

32. El 17 de octubre de 2011, Rosa comenzó a trabajar en Pall en el puesto de Operator.

33. Rosa ocupó únicamente el puesto de Operator, mientras trabajó para la Compañía.

34. El 15 de julio de 2014, Rosa acusó recibo del *job description* del puesto de Operator.

35. Rosa trabajó en GVS hasta el 31 de enero de 2023, fecha en la que fue despedida y se le entregó la "Notificación de Separación".

36. Rosa desconoce cómo podían variar los días por enfermedad y vacaciones que le ofreció Kelly a los que tenía en GVS.

37. Rosa rechazó la oferta de Kelly, por lo que no vio si los beneficios ofrecidos variaron.

38. Ningún empleado de GVS se comunicó con Rosa para que regresara a trabajar o recontratarla en la Compañía como empleada regular.

Isabel Montes

39. El 21 de diciembre de 2009, Montes comenzó a trabajar en Pall, en el puesto de Operador.

40. Montes únicamente ocupó el puesto de Assembler en el Departamento de Manufactura.

41. El 10 de julio de 2014, Montes acusó recibo del *job description* del puesto de Assembler.

42. El 1 de febrero de 2023, GVS despidió a Montes y le entregó la "Notificación de Separación".

43. Montes desconoce los términos y condiciones de la oferta de Kelly y tampoco vio oferta de empleo alguna.

44. Ningún empleado de GVS contactó a Montes para que regresara a trabajar en la Compañía como empleada regular, ni con el propósito de recontratarla.

Angelina Osorio

45. El 21 de diciembre de 2009, Osorio comenzó a trabajar para Pall en el puesto de Operador en el Departamento de Leuko.

46. El 30 de junio de 2014, Osorio acusó recibo del *job description* de Assembler.

47. El 31 de enero de 2023, GVS despidió a Osorio y le entregó la "Notificación de Separación".

48. Personal de Kelly se comunicó con Osorio para ofrecerle un trabajo temporero, pero Osorio desconoce los beneficios que ofrecía Kelly.

49. Ningún empleado de GVS llamó a Osorio para reclutarla nuevamente en la Compañía.

Damaris Carrillo

50. El 15 de agosto de 2005, Carrillo comenzó a trabajar en Pall como empleada regular, en el puesto de Operador.

51. Durante su empleo, Carrillo únicamente ocupó el puesto de Operador.

52. Para el 2022, Carrillo trabajaba en el primer turno en la línea de No-Leuko en el Área de Manufactura, bajo la supervisión de Ana María Ramos.

53. El 30 de junio de 2014, Carrillo acusó recibo del *job description* del puesto de Assembler.

54. El 31 de enero de 2023, GVS despidió a Carrillo y le entregó la "Notificación de Separación".

55. Kelly se comunicó con Carrillo para hacerle una oferta de empleo temporero, pero nunca le mencionó que la oferta era sin beneficios.

56. Carrillo admitió que, luego de su despido, nunca le han ofrecido una plaza como empleada regular de GVS.

Johanna Pérez

57. El 12 de septiembre de 2005, Pérez comenzó a trabajar en Pall como empleada regular en el puesto de Operador.

58. El 23 de marzo de 2022, Pérez pasó a ocupar el puesto de Product Release Coordinator bajo la supervisión de Marlene Ortiz en el Área de Calidad.

59. El 23 de marzo de 2022, Pérez acusó recibo del *job description* del puesto de Product Release Coordinator.

60. Aparte de Pérez, para el 31 de enero de 2023, Crespo era la otra persona que ocupaba el puesto de Product Release Coordinator en GVS.

61. Crespo realizaba funciones de Product Release Coordinator desde antes de que Pérez pasara a ocupar dicha posición.

62. El 31 de enero de 2023, GVS despidió a Pérez y le entregó la "Notificación de Separación".

63. Pérez recibió alrededor de cinco amonestaciones durante su empleo.

Luz Figueroa

64. El 15 de agosto de 2005, Figueroa comenzó a trabajar en Pall en el puesto de Operadora.

65. Figueroa ocupó únicamente el puesto de Assembler.

66. El 30 de junio de 2014, Figueroa acusó recibo del *job description* del puesto de Assembler.

67. Figueroa admitió que el *job description* recoge las funciones que se tenían que hacer como Assembler.

68. Para el momento de su despido, Figueroa estaba asignada a trabajar en la línea de la No Leuko.

69. El 31 de enero de 2023, GVS despidió a Figueroa y le entregó la "Notificación de Separación".

70. Figueroa admitió que GVS tenía una política contra el discrimen y que nunca se quejó de discrimen.

71. Figueroa admitió que habían personas de mayor edad que ella que se quedaron trabajando en GVS.

Lisandra Rivera

72. El 15 de agosto de 2005, Rivera comenzó a trabajar en Pall en el puesto de Operator.

73. Rivera únicamente ocupó el puesto de Assembler en el área de Manufactura.

74. Durante su último año de empleo, Rivera estuvo asignada en la línea Leuko.

75. El 10 de julio de 2014, Rivera acusó recibo del *job description* del puesto de Assembler.

76. Rivera admitió que el *job description* del puesto de Assembler reflejaban correctamente sus funciones.

77. El 31 de enero de 2023, GVS despidió a Rivera y le entregó la "Notificación de Separación".

78. El 21 de marzo de 2007, Rivera recibió alrededor de seis (6) amonestaciones durante su empleo.

79. Rivera nunca se quejó de discrimen.

80. Rivera admitió que, luego de su despido, personas de mayor edad que ella se quedaron trabajando y que personas de menor edad también fueron despedidas.

Ivette Rodríguez

81. El 17 de octubre de 2011, Rodríguez comenzó a trabajar en Pall como empleada regular en el puesto de Operator.

82. Mientras Rodríguez trabajó para GVS, únicamente ocupó el puesto de Assembler, en el Departamento de Manufactura.

83. El 10 de septiembre de 2014, Rodríguez acusó recibo del *job description* del puesto de Assembler.

84. Rodríguez declaró que las funciones que menciona el *job description* eran las que ella hacía como Assembler.

85. 85. El 31 de enero de 2023, GVS despidió a Rodríguez y le entregó la "Notificación de Separación".

86. 86. Al despedir a Rodríguez, GVS también despidió a otros empleados de menor edad que Rodríguez, mientras también se quedaron empleados de mayor edad que ella trabajando en GVS.

87. Rodríguez nunca se quejó de discrimen.

María Pomales

88. El 10 de enero de 2011, Pomales comenzó a trabajar en Pall como empleada regular en el puesto de Operator.

89. Pomales ocupó únicamente el puesto de Operadora en el Departamento de Manufactura.

90. El 10 de julio de 2014, Pomales acusó recibo del *job description* del puesto de Assembler.

91. Pomales declaró que las funciones que menciona el *job description* eran las que ella hacía como Assembler.

92. El 31 de enero de 2023, GVS despidió a Pomales y le entregó la "Notificación de Separación".

Nancy Bartolomey

93. El 21 de diciembre de 2009, Bartolomey comenzó a trabajar en Pall en el puesto de Operador.

94. El 10 de junio de 2014, Bartolomey acusó recibo del *job description* del puesto de Assembler.

95. Bartolomey admitió que el *job description* recogía sus funciones como Assembler, incluyendo al momento de su terminación.

96. El 31 de enero de 2023, GVS despidió a Bartolomey y le entregó la "Notificación de Separación".

97. Bartolomey nunca se quejó de discrimen.

98. Bartolomey admitió que personas mayores que ella se quedaron trabajando en GVS luego de su despido.

Edwin Concepción

99. 99. El 17 de octubre de 2011, Concepción comenzó a trabajar en Pall como empleado regular en el puesto de Operator.

100. Concepción luego ocupó el puesto de Quality Inspector, en el Departamento de Quality.

101. Efectivo el 13 de agosto de 2018, Concepción pasó a ocupar el puesto de Distribution Specialist, en el Departamento de Supply Chain.

102. El 27 de agosto de 2018, Concepción acusó recibo del *job description* del puesto de Distribution Specialist.

103. Desde el 2022 al 2023, Concepción estuvo realizando funciones como QA Incoming Inspector, bajo la supervisión de Marlene Ortiz.

104. El 31 de enero de 2023, GVS despidió a Concepción y le entregó la "Notificación de Separación".

105. Mientras Concepción trabajó en GVS, nunca se quejó de discrimen por razón de edad.

Cónsono con estas determinaciones de hechos, el foro primario concluyó que las Apelantes no presentaron prueba que contrarrestara la posición de GVS en cuanto a que el despido de los empleados de la compañía se llevó a cabo por una decisión empresarial de negocio. Asimismo, concluyó que las Apelantes no demostraron que, en el caso de marras, aplicaba el Artículo 3 de la Ley Núm. 80, *supra*. A tono con todo lo anterior, el foro primario

declaró *Ha Lugar* las solicitudes de sentencia sumaria instadas por GVS tanto en el caso FA202023CV00743 y el caso FA2024CV00069, y en consecuencia desestimó con perjuicio las reclamaciones que dieron origen a estos pleitos.

Inconforme, el 29 de mayo de 2025, las Apelantes presentaron el recurso de epígrafe y formularon los siguientes señalamientos de error:

> Erró el TPI por motivo a que realizó, determinaciones de credibilidad, sobre hechos materiales, al momento de resolver la Moción de Sentencia Sumaria, y la oposición a la misma, y adoptó como ciertos, los hechos 23-26, de la moción de sentencia sumaria relacionadas con la posición ocupada por las apelantes, y de que la apelada no despidió a otros empleados, que ocupaban la misma posición que las querellantes, de "Assembler" y que fueron especificados con nombres y apellidos por estas, y que tenían menos antigüedad que las apelantes, violando así, el principio de antigüedad y el orden de retención establecido en el Artículo 3 de la Ley Núm. 80. El TPI alego incorrectamente, que las apelantes no identificaron a las personas que se quedaron trabajando en la apelada, que ocupaban la posición de "Assembler" y que tenían menos antigüedad que estas, lo cual es incorrecto, debido a que las apelantes, en los párrafos 23-26, especificaron los nombres de las personas que no fueron despedidas, y se quedaron trabajando, y que ocupaban la plaza de "Assembler" al igual que las apelantes, y que tenían menos antigüedad que las apelantes, por lo que erro el TPI, en sus conclusiones de hecho y derecho en la Sentencia.

> Erró el TPI en sus conclusiones de hecho y derecho, y realiz[ó] determinaciones de credibilidad, y no le dio ningún tipo de credibilidad a las alegaciones y la evidencia de las apelantes, en cuanto a hechos materiales, en su conclusión de que las apelantes desconocían las posiciones y/o plazas de los empleados que se quedaron trabajando en la apelada, al momento del despido de ellas, por lo que no podían sustentar sus alegaciones, no empece a que las apelantes, en los párrafos 23-26 de la Oposición, establecieron que los empleados que se quedaron trabajando y no fueron despedidos, y que tenían menos antigüedad que las apelantes, ocupaban la plaza de "Assembler", que era la misma plaza que ocupaban las apelantes al momento del despido, por lo que err[ó] el TPI en su conclusión de hecho y derecho de que las apelantes desconocían la plaza ocupada por los empleados que se quedaron trabajando y que tenían menos antigüedad que ellas.

> Erró el TPI en sus conclusiones de hecho y derecho en la Sentencia, al concluir que el testimonio de las

apelantes, bajo juramento, durante sus respectivas deposiciones, relacionadas al conocimiento personal de estas y lo observado por estas día a día, por años, con respecto a la posición ocupada por los empleados que se quedaron trabajando al momento del despido de las apelantes, que ocupaban la plaza de "Assembler" que era la misma plaza ocupada por las apelantes, era prueba de referencia, inadmisible en un juicio, por lo que no podía ser tampoco considerado al momento de evaluar la moción de sentencia sumaria, lo cual es un error que amerita la revocación de la Sentencia.

Erró el TPI en sus conclusiones de hecho y derecho en la Sentencia, y realiz[ó] determinaciones de credibilidad, y concluir, sin brindarle ningún tipo de credibilidad y tampoco considerar las alegaciones y la evidencia de las apelantes, que la apelada elimin[ó] la posición de "Assembler" que ocupaban las apelantes, por lo que el despido fue justificado, no empece a que según el párrafo 45 de la Oposición, 45 días luego del despido de las apelantes, el cual ocurri[ó] el 31 de enero, del 2023, la apelada le ofreció a las apelantes ocupar la misma plaza que estas ocupaban de "Assembler", en la misma línea de producción, haciendo lo mismo, como "Assembler", sin embargo, como empleadas nuevas, bajo la reforma laboral del 2017, firmando contrato como empleados temporeros, sin ningún beneficio, lo cual crea una controversia d[e] hechos materiales acerca de si la plaza que ocupaban las apelantes fue eliminada o no a raíz de la supuesta reorganización, y si las apelantes fueron despedidas, para luego, 45 días después, ser contratadas como empleadas nuevas, bajo la reforma laboral, en la misma plaza que ocupaban, pero sin ningún beneficio, firmando contratos de empleado temporero, todos los meses, sin ningún beneficio, lo cual confirma que la plaza de estas de "Asssembler" nunca fue eliminada, por lo que el despido de estas fue injustificado, y además en violación al Artículo 3.18 de la reforma Laboral, que enmienda el inciso (b) del Artículo 5 de la Ley 180 del 1998.

El 3 de junio de 2025, esta Curia emitió *Resolución* mediante la cual se le concedió a la Apelada un término de treinta (30) días para exponer su posición. Oportunamente, el 18 de julio de 2025, GVS presentó *Alegato en Oposición de la parte Apelada*. Con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**II.**

***A. Sentencia Sumaria***

La sentencia sumaria es el mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Soto y otros v. Sky Caterers,* 215 DPR___ (2025), 2025 TSPR 3, pág. 10; Véase, además, *BPPR v. Cable Media,* 215 DPR___ (2025), 2025 TSPR 1. La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que la prueba que acompaña la solicitud de sentencia sumaria debe surgir preponderantemente la inexistencia de controversia sobre los hechos medulares del caso. *Cooperativa de Seguros Múltiples de Puerto Rico y otro v. Estado Libre Asociado de Puerto Rico y otros*, 216 DPR___ (2025), 2025 TSPR 78, pág. 9.

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. V. M. Cuebas*, 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

> el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de

Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas*, *supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros*, 213 DPR 80, 91-92 (2023) citando a *Meléndez González et al. v. M. Cuebas, supra.*

En tal sentido, como parte de nuestra función revisora, es nuestro deber evaluar todos los documentos que obren en el expediente de manera tal que, previo a determinar la procedencia de una solicitud de sentencia sumaria, se deba realizar un balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles. *BPPR v. Cable Media,* supra*, pág. 9 (citas omitidas). Cónsono con lo anterior, en el ejercicio de nuestra función revisora, estamos limitados a: (1) considerar los documentos que se presentaron ante el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se

aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 994 (2024).

Por otra parte, nuestra más Alta Curia ha definido el concepto hecho material de la siguiente forma: un hecho material o esencial es "aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Consejo de Consejo Tit. v. Rocca Dev. Corp., et als.,* supra, 215 DPR___ (2025) 2025 TSPR 6, pág. 15. Por ende, la parte promovente tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Soto y otros v. Sky Caterers,* supra, pág. 11.

Por su parte, la Regla 36.4 de Procedimiento Civil, *supra,* dispone que si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, no se concede todo el remedio solicitado o se deniega la moción, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos. De la misma forma, el tribunal deberá establecer hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando así que los procedimientos ulteriores sean justos en el pleito. *Íd.* A tono con lo anterior, la precitada regla establece que, al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad. *Íd.*

### B. El despido injustificado en Puerto Rico

Nuestro ordenamiento jurídico está orientado a la protección de los trabajadores para evitar las prácticas injustas en el ambiente laboral. *Rivera Figueroa v. The Fuller Brush. Co.*, 180 DPR 894, 903 (2011). En virtud de tales principios, la Ley sobre

Despidos Injustificados, Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185a, según enmendada, (en adelante, "Ley Núm. 80"), garantiza el derecho a recibir indemnización a los empleados despedidos sin justa causa. El propósito de esta legislación es "proteger a los empleados de actuaciones arbitrarias del patrono mediante el establecimiento de remedios económicos que desalienten los despidos injustificados". *Méndez Ruiz v. Techno Plastics*, 216 DPR___ (2025), 2025 TSPR 68, *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 770 (2022).

Esta medida legislativa aplica a los empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración y (3) sean despedidos de su cargo sin que haya mediado justa causa. *Rivera Figueroa v. The Fuller Brush. Co., supra* pág. 906. La precitada ley procura evitar las actuaciones arbitrarias del patrono e impone remedios económicos para desalentar los despidos injustificados. *Ortiz Ortiz v. Medtronic, supra*, pág. 770; *SLG Torres-Matundan v. Centro Patología,*193 DPR 920, 929 (2015). A su vez, "tiene un fin reparador al proveer a los empleados remedios consustanciales a los daños causados por despidos injustificados". *Reyes Sánchez v. Eaton Electrical,* 189 DPR 586, 596 (2013); *Beauchamp v. Holsum Bakers of P.R.,* 116 DPR 522, 526 (1985).

Ahora bien, no existe una prohibición absoluta contra el despido de un empleado. *Figueroa v. The Fuller Brush. Co., supra,* pág. 904. Aunque la Ley Núm. 80 no define con precisión qué constituye un despido injustificado, enumera una serie de supuestos que justifican el despedido de un empleado.

Particularmente, el Artículo 2 de la Ley Núm. 80, *supra,* delimita una serie circunstancias que justifican el despido de un empleado:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público. (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción de ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.29 LPRA sec. 185b.

Nótese que esta legislación no es un código de conducta, ni establece una lista de faltas definidas o taxativas, puesto que no pretende, ni puede considerar la variedad de circunstancias y normas de los múltiples establecimientos de trabajo. *González Santiago v. Baxter Healthcare*, 202 DPR 281, 292 (2019); *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 930 (2015).

De otro lado, el Artículo 3 de la Ley Núm. 80, *supra*, dispone lo siguiente:

En cualquier caso en que se despidiesen empleados por las razones indicadas en los incisos (d), (e) y (f) del Artículo 2 de esta Ley, el patrono estará obligado a retener con preferencia en el empleo a los empleados de más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por ellos, entendiéndose que se dará preferencia a los empleados despedidos en caso de que dentro de los seis (6) meses siguientes a su cesantía tuviere

necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados al momento de su despido y dentro de su clasificación ocupacional, siguiéndose también el orden de antigüedad en la reposición. No obstante, al momento del despido como en la nueva contratación, cuando exista una diferencia razonablemente clara o evidente a favor de la capacidad, productividad, desempeño, competencia, eficiencia o historial de conducta de los empleados comparados, el patrono podrá seleccionar a base de dichos criterios. 29 LPRA sec. 185c

A su vez, el Artículo 4.6 de la Ley de Transformación y Flexibilidad Laboral, Ley Núm. 4-2017, 29 LPRA sec. 121 *et seq.* incorporó el Artículo 3-A de la Ley Núm. 80, *supra.* El mismo dispone lo siguiente:

En el caso de despidos por las razones contempladas en los incisos (d), (e) y (f) del Artículo 2 de esta Ley, cuando el patrono tiene varias oficinas, fábricas, sucursales o plantas en Puerto Rico, los criterios de selección identificados en el Artículo 3 de esta Ley se aplicarán únicamente dentro de cada establecimiento físico impactado por la reducción de personal. No obstante, cuando durante el año inmediatamente previo: (1) los empleados de las clasificaciones ocupacionales afectadas usual y frecuentemente se trasladaban de un establecimiento a otro; y (2) los empleados estaban bajo supervisión directa común en la administración diaria del personal, se deberá comparar a los empleados de los establecimientos así integrados. El hecho de que los empleados participaban de beneficios comunes o estaban regidos por normas o reglas comunes, no será pertinente para la aplicación del método de selección establecido en este Artículo. Además, en las situaciones en que aplique dicho criterio por excepción, el criterio se utilizará únicamente con respecto a las clasificaciones ocupacionales y los establecimientos donde estén presentes dichas características de operación integrada.

De otra parte, aunque la intención primordial de la aludida Ley no avala el despido ante una primera sanción, "el citado estatuto no excluye de la sanción o despido en primera o única ofensa aquella falta cuya intensidad de agravio así lo requiera en protección de la buena marcha de la empresa y la seguridad de las personas que allí laboran". *Feliciano Martes v. Sheraton,* 182 DPR 368, 383 (2011); *Rivera v. Pan Pepín,* 61 DPR 681, 690 (2004).

Ahora bien, en cuanto a la presunción aplicable en una causa de acción al amparo de esta legislación, el Tribunal Supremo de Puerto Rico en *Méndez Ruiz v. Techno Plastics, supra,* pág. 17-18 expresó:

> Finalmente, el esquema estatutario de la Ley de Despido Injustificado establece una presunción de que todo despido es injustificado y le impone al patrono el deber de demostrar, mediante preponderancia de la prueba, que hubo justa causa para el mismo. No obstante, para disfrutar de dicha presunción, el demandante tiene la obligación de aportar prueba que establezca los hechos básicos que dan lugar a la presunción, a saber: (1) que fue empleado por tiempo indeterminado del patrono; (2) que recibía remuneración por su trabajo, y (3) que fue despedido de su puesto. Íd., pág. 775. Una vez se activa la presunción estatutaria a favor del obrero, el patrono tiene la obligación de presentar prueba para rebatir la presunción y, además, persuadir al juzgador de los hechos mediante preponderancia de la evidencia. (citas omitidas)

**III.**

En el presente recurso, las Apelantes nos solicitan que revoquemos la *Sentencia* dictada sumariamente por el foro primario el 12 de mayo de 2025, la cual fue notificada el 19 de mayo del mismo año. Argumentan, como su primer señalamiento de error, que el foro *a quo* incidió al adoptar como incontrovertidos, los hechos 22, 23, 24, 25 y 26 propuestos por GVS en su moción de sentencia sumaria. Sobre lo anterior, abundan que las aludidas determinaciones de hechos eran contrarias al principio de antigüedad reconocido en el Artículo 3 de la Ley Núm. 80, *supra*, y, además, sostienen que rebatieron dichos hechos propuestos en su moción en oposición a la solicitud de sentencia sumaria. Por otro lado, como segundo señalamiento de error, esgrimen las Apelantes que el foro primario incidió al no darle credibilidad a sus alegaciones y a la evidencia presentada. En vista de ello, cuestionan la determinación del foro *a quo* respecto a que éstas, las Apelantes, desconocían las posiciones de los empleados de menor antigüedad que se quedaron trabajando para GVS en las mismas posiciones que ocupaban las Apelantes, pese a que, en su escrito en oposición a la solicitud de sentencia sumaria, identificaron a dichos empleados.

De otro lado, como tercer error, esbozan que el foro primario incidió al concluir que el testimonio de las Apelantes durante las

deposiciones constituía prueba de referencia inadmisible en un juicio. Por último, levantaron como cuarto error, el que el foro primario concluyera que el despido de las Apelantes fue justificado, ello pese a que GVS les ofreció empleo a éstas luego del despido. Por su parte, GVS argumentó que el despido de las Apelantes se debió a una reorganización de la empresa y que, además, las Apelantes no presentaron prueba que rebatiera las determinaciones de hechos propuestas por la Apelada. Veamos.

Toda vez que el recurso de epígrafe versa sobre la revisión de un dictamen resuelto por la vía sumaria, le corresponde a este foro revisor realizar un examen *de novo,* tanto de la solicitud de sentencia sumaria y sus anejos, así como su oposición.[11] Efectuado el análisis correspondiente, resolvemos que ambas partes cumplieron esencialmente con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra.*

Atendido lo anterior, nos corresponde determinar si existen hechos materiales en controversia y, de haberlos, exponer concretamente cuáles son. De igual forma, se esbozarán los hechos que estén incontrovertidos. Véase, *Roldán Flores v. M. Cuebas et al., supra.* En su recurso, las Apelantes cuestionan que el foro primario haya adoptado como incontrovertidos los siguientes hechos propuestos por GVS:

23. En el caso de los Assemblers, GVS despidió a los empleados de dieciséis (16) años de antigüedad o menos que estaban trabajando en la planta para el 31 de enero de 2023.

24. En el caso de los Assemblers con diecisiete (17) años de antigüedad, además de considerar la antigüedad de los empleados, GVS consideró en qué línea estaban trabajando los empleados en el último año, es decir entre el 2022 al 2023. Considerando los siguientes criterios en cuanto a las líneas de manufactura, y la necesidad operacional en ese momento, GVS procedió con los despidos el 31 de enero de 2023 como sigue:

---

[11] Cabe aclarar que, si bien la *Sentencia* apelada resolvió dos (2) mociones de sentencia sumaria de dos (2) casos distintos, únicamente examinaremos los escritos concernientes al caso FA2023CV00743. Ya esta *Curia* atendió el recurso proveniente del caso FA2024CV00069 mediante la *Sentencia* dictada el 27 de junio de 2025 en el alfanumérico TA2025AP00019.

      a. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban en la línea de GPT no fueron despedidos.

      b. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban únicamente en línea de Leuko y tenían la menor cantidad de acciones disciplinarias no fuerondespedidos. A esos efectos, los Assemblers de diecisiete (17) años de antigüedad que operaban únicamente la línea Leuko, tenían la siguiente cantidad de acciones disciplinarias:

          i. Ángel Flores – 7

          ii. Lisandra Rivera – 8

          iii. Nilda Rodríguez – 4

          iv. Luz Matta – 1

      c. Los Assemblers con diecisiete (17) años de antigüedad que únicamente trabajaban en la línea No Leuko fueron despedidos.

      d. Los Assemblers con diecisiete (17) años de antigüedad que trabajaban tanto en la línea Leuko como en la línea No Leuko fueron despedidos.

25. Los Assemblers con diecisiete (17) años de antigüedad que hubiesen participado en algún proyecto y/o tarea especial necesaria para la operación no fueron despedidos. A esos efectos,

      a. Marilym Rodríguez – participó de un proyecto especial con relación al sistema de SAP y de data entry.

      b. Tania Penaloza – participó de un proyecto especial con relación al sistema de SAP y de data entry.

      c. Migdalia Resto – participó de un proyecto especial con relación al área de ingeniería.

      d. Yesenia Oyola – participó de una tarea especial con la inspección de materiales en la Compañía.

26. En el caso del puesto de Product Release Coordinator, además de Pérez, Nancy Crespo Dones ("Crespo") era la otra persona que ocupaba dicho puesto desde el 16 de marzo de 2015. Entre ellas, Crespo tenía una sola acción disciplinaria, mientras que Pérez tenía cinco (5) acciones disciplinarias en su expediente de personal.[12]

Estas determinaciones de hechos propuestas por GVS estuvieron sustentadas por una declaración jurada realizada por el señor David Jara Sanhueza ("señor Jara"), Director Regional de GVS.[13] Esencialmente, se desprende de dicha declaración jurada que el señor Jara participó en la toma de decisiones que culminó con el despido de los empleados de GVS.[14] A esos fines, el señor

---

[12] Véase, Apéndice del Recurso, págs. 47-48.
[13] *Íd.*, págs. 69-78.
[14] *Íd.*, pág. 72.

Jara explicó el funcionamiento de la compañía, las razones por las cuales se reorganizó la empresa y la metodología que se usó para cesantear a los (37) treinta y siete empleados despedidos.[15] Dicha metodología quedó recogida en las determinaciones de hecho 23, 24, 25 y 26 propuestas por GVS y, posteriormente, acogidas por el foro primario como hechos incontrovertidos en la *Sentencia* apelada.

Ahora bien, en su escrito de oposición a la moción de sentencia sumaria, las Apelantes cuestionaron estos hechos propuestos por la Apelada. Especificaron que las mismas contravenían el principio de antigüedad proveniente del Artículo 3 de la Ley Núm. 80, *supra*. Ante este cuadro, las Apelantes identificaron a personas que se mantuvieron trabajando para GVS, las cuales ocupaban la clasificación *Assembler*, la misma clasificación ocupacional que ostentaba algunas de las Apelantes.[16] Abundaron que estos empleados que continuaron laborando para GVS tenían menos años de antigüedad que las Apelantes.

No obstante, lo anterior, al hacer un contraste entre las aludidas determinaciones de hecho propuestas por GVS y la oposición a estas por parte de las Apelantes, notamos que esta última no logró rebatir lo propuesto por la Apelada. Si bien es cierto que las Apelantes identificaron a un grupo de personas que trabajaban en el mismo área que ellas, según la prueba presentadas por éstas, no lograron demostrar **con evidencia** que se tratara de empleados regulares con la clasificación *Assembler*. De hecho, surge de la prueba que obra en el expediente que a las Apelantes no le constaba de **propio y personal conocimiento** la

---

[15] *Íd.*, págs. 69-78.
[16] Se desprende del expediente que Brenda Liz Rosa, Damaris Carrillo, Isabel Montes y Angelina Osorio ocuparon la clasificación de *Assembler* al momento de su despido, mientras que Johanna Pérez Williams ocupaba el puesto de *Product Release Coordinator*. Véase, Apéndice del Recurso, págs. 161-168; 179-180 para los *Job Description* firmados por las Apelantes.

clasificación ocupacional de los empleados señalados o los años que llevaban trabajando en la empresa. Prueba de ello, es el testimonio vertido por una de las Apelantes, Damaris Carrillo, en la deposición que se le tomó el 22 de agosto de 2024, en la que expuso lo siguiente:

> P. Okey. Para que quede claro, verdad, este... ¿con quién usted se...? ¿A...? ¿Quién usted entiende que se quedó trabajando en la Compañía que llevaba menos tiempo que usted?
>
> R. Kevin, Kevin Laboy. Este... William Báez. Michael Rivera. Y un tal "Luis"; no sé si el apellido es Rodríguez. No me recuerdo el apellido de Luis.
>
> [...]
>
> R. Bueno, yo siempre le decía "as..." Yo le digo "assembler"
>
> P. Pero usted no sabe si...
>
> R. Pero que... como lo veía en la línea trabajando.
>
> P. **Por eso; pero usted no sabe a quién él se le reportaba. ¿Correcto?**
>
> R. **Correcto.**
>
> P. **Ni cuál... cuáles eran sus funciones propiamente.**
>
> R. **Correcto.**
>
> P. Okey. Le pregunto también, ¿si usted sabe si el señor Kevin Laboy se reportaba al Departamento de Ingeniería?
>
> R. **Desconozco.**
>
> [...]
>
> P. Okey. Me mencionó también al señor William Báez. ¿Usted sabe la fecha de contratación de este empleado?
>
> **R. No. Yo sé que llegó al tercer turno.**
>
> P. ¿Sabe el puesto que ocupaba el señor William Báez al treinta y uno (31) de enero de dos mil veintitrés (2023)?
>
> R. Pues Assembler también.
>
> P. ¿Usted sabe?
>
> R. Bueno, como él trabajó en línea también.
>
> **P. Pero podía haber trabajo en línea por necesidades operacionales. ¿Pero usted sabe si él ocupaba otro puesto?**
>
> **R. No.**
>
> [...]
>
> **P. Okey. Entonces me mencionó también a Michael Rivera. ¿Usted sabe la fecha de contratación de Michael Rivera?**
>
> **R. No.**
>
> **P. ¿Sabe cuántos años llevaba en la Compañía?**
>
> **R. No** (Énfasis nuestro).[17]

---

[17] *Íd.*, págs. 228-231.

De otra parte, otra de las Apelantes, Brenda Liz Rosa expresó en la deposición que se le tomó el 13 de junio de 2024 lo siguiente:

R ...hay una persona que se llama Yahaira Aponte.

P. Cuantos años ella llevaba en la Compañía?

R. Meses.

**P. Usted sabe su fecha de contratación**

**R. No.**

P. ¿Usted sabe que puesto ocupa Yahaira?

R. Bueno, ella entró como operadora. Después la pusieron a medir, porque yo le estaba dando *training* también. P. Cuando usted dice "training", usted se refiere a que habían ocasiones que, pues, por el *ass...* operador tener experiencia en esa área, pues podía asistir en explicarle a los empleados que también llegaron a ese puesto a hacer esas funciones. ¿Correcto?

R. Correcto.

P. Okey. Le pregunto nuevamente, ¿si usted sabe qué puesto tenía Yahaira para el treinta y uno (31) de enero de dos mil veintitrés (2023)?

R. Assembler.

**P. ¿Cómo usted sabe eso?**

**R. Porque yo le estaba dando training.**

[...]

**P . Por eso. Pero la pregunta es, señora Rosa, ¿si usted sabe de propio y personal conocimiento cuál era el puesto que ocupaba esta persona?**

**R. No.**[18]

De igual manera, es destacable el testimonio vertido por otra de las Apelantes, Angelina Osorio, en la deposición que se le tomó el 22 de agosto de 2024, de la cual surge lo siguiente:

P. Ya entendí, ya entendí. Entonces, las... la realidad entonces es que, cuando usted me dice que allí quedaron personas con menos tiempo que usted, para yo estar claro entonces, **usted no sabe cuál es la posición de esas personas que llevan menos tiempo que usted, que se quedaron trabajando en la compañía. ¿Correcto? R. No.**[19]

Nótese que, si bien algunas Apelantes nombraron a varias personas, éstas nunca pudieron constatar cual era la clasificación ocupacional de las personas nombradas ni cuál era su relación con el patrono, entiéndase, si tenían un contrato temporero o permanente. Igualmente, el testimonio de algunas de las Apelantes no estaba sustentado en información que **le constara de propio y**

---

[18] *Íd.*, págs. 369-370.
[19] *Íd.*, pág. 389.

**personal conocimiento**. Sabido es que la propia Regla 36.3 (b) (2) de Procedimiento Civil, *supra*, dispone que la contestación a una moción de sentencia sumaria debe contener "una relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u **otra prueba admisible en evidencia** donde se establecen los mismos. (Énfasis nuestro)" A su vez, la Regla 602 de Evidencia, 32 LPRA Ap. VI, R. 602 establece que "[s]alvo lo dispuesto en estas reglas sobre opiniones de peritos, una persona testigo **sólo podrá declarar sobre materia de la cual tenga conocimiento personal**" (Énfasis nuestro).

Cónsono con lo antes expuesto, es forzoso concluir que la prueba presentada por las Apelantes para controvertir los hechos 23, 24 y 25 propuesto por GVS no fue suficiente. En cuanto al hecho número 26 propuesto por la Apelada, se enfoca en que una de las Apelantes, Johanna Pérez Williams, fue despedida no solo tomándose en consideración el tiempo trabajado en la empresa sino que, además, se tomó en consideración su historial disciplinario en la compañía. En su escrito en oposición, las Apelantes tampoco presentaron prueba suficiente que rebatiera este hecho.  En vista de los anterior, colegimos que los primeros tres (3) señalamientos de error, los cuales giran en torno a las determinaciones de hechos antes mencionadas, no se cometieron. Por consiguiente, somos del criterio que el foro primario no incidió al adoptar las determinaciones de hechos 23, 24, 25, y 26.

Así pues, como corolario de lo anterior, y tras un análisis minucioso del expediente del caso, los documentos, las declaraciones juradas y las deposiciones anejadas en la solicitud de sentencia sumaria, así como las de la oposición, **no**

**encontramos la existencia de hechos materiales en controversia**. Cónsono con lo antes expuesto, adoptamos **las determinaciones de hechos formuladas por el foro primario como hechos materiales incontrovertidos**.

Resuelto lo anterior, corresponde entonces revisar *de novo* si el foro primario aplicó correctamente el derecho a la controversia que nos ocupa. De esta manera, procedemos a discutir si conforme a la Ley Núm. 80, *supra*, las Apelantes fueron despedidas sin justa causa. En su escrito, GVS sostiene que en el 2022 y 2023 llevó a cabo unas evaluaciones en torno al desempeño operacional de la empresa. Estas evaluaciones dieron pie a que la Apelada decidiera reorganizar sus operaciones lo cual incluyó la eliminación del segundo turno, cuyo horario era de 2:30 pm a 11:30 pm en el área de manufactura. Ello repercutió en que varios empleados se vieran afectados por esta determinación. Estos ajustes operacionales culminaron con el despido de treinta y siete (37) empleados.

Por su parte, las Apelantes sostienen que GVS no presentó evidencia que demostrara la situación económica de la Apelada. No le asiste la razón. Del expediente surge que la Apelada presentó una declaración jurada suscrita por el señor Jara, Director Regional de GVS, quien participó en la toma de decisiones referente a la restructuración de la compañía. La aludida declaración jurada estuvo a su vez apoyada por una serie de documentos con información financiera tales como los informes financieros para el año 2022 y 2023 y una hoja de datos con la información de los empleados, en la cual se ilustra quienes fueron cesanteados y quienes retuvieron su empleo.

Es de observar que, la prueba presentada por GVS es suficiente para que concluyamos que el despido de los empleados de la compañía, incluyendo a las Apelantes, fue con justa causa a

tenor con el Artículo 2 (f) de la Ley Núm. 80, *supra*,[20] **toda vez que GVS demostró que los despidos respondieron "a una decisión gerencial válida** a la luz de las circunstancias y que no obedeció a un mero capricho o arbitrariedad". *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 1002 (2022).

Ahora bien, en su escrito en oposición, las Apelantes solicitaron que se dictara sentencia sumaria por una causa de acción al amparo de la Ley Núm. 4-2017 y del Artículo 3 (b) de la *Ley de Vacaciones y Licencia por Enfermedad de Puerto Rico*, Ley Núm. 180-1998, según enmendada, 29 LPRA sec. 250b. La referida disposición establece:

> Aquel empleado que laboraba para un patrono antes de entrar en vigor la "Ley de Transformación y Flexibilidad Laboral", que por ley tuviese derecho a tasas de acumulación mensual de licencia por vacaciones y enfermedad superiores a lo dispuesto por la "Ley de Transformación y Flexibilidad Laboral", continuará disfrutando de las tasas de acumulación mensual de dichos beneficios que le fuera aplicable previamente. Estas disposiciones serán de aplicación mientras trabaje para el mismo patrono.

> Será una práctica ilegal de empleo que un patrono despida, destituya o suspenda indefinidamente a un empleado, que trabaje para dicho patrono con anterioridad a la vigencia de la "Ley de Transformación y Flexibilidad Laboral", con el objetivo de contratarle nuevamente o sustituirlo con un empleado nuevo para que la acumulación por concepto de licencia de vacaciones y de enfermedad sea conforme al esquema establecido mediante la "Ley de Transformación y Flexibilidad Laboral".

En otras palabras, este Artículo penaliza al patrono que despida a un empleado para luego volverlo a contratar con el fin de disminuirle la acumulación de licencias de vacaciones y enfermedad. En tal sentido, las Apelantes argumentan que la

---

[20] El texto del referido Artículo lee de la siguiente manera:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:

> [...]

> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

oferta que le realizó la compañía Kelly para trabajar en la planta de GVS violentaba el estatuto previamente reseñado, pues le ofrecía una acumulación menor de licencias por enfermedad y vacaciones. Empero, la prueba que obra en el expediente, a través de las declaraciones bajo juramento manifestada por alguna de las Apelantes en las deposiciones, exponen que estas ni tan siquiera tenían conocimiento de la cantidad de horas por concepto de licencias de vacaciones o enfermedad que acumularían si hubieran aceptado la oferta de Kelly.

En lo pertinente, en su deposición, la señora Brenda Liz Rosa expuso lo siguiente en cuanto a la oferta que le realizó Kelly:

> P. Usted me mencionó, verdad, que no sabe el año ni el número de la Ley, pero que ha leído la Ley. ¿Usted sabe qué dice la Ley, en sus propias palabras, sobre la Ley... sobre las vacaciones y enfermedad?
>
> R. Bueno, no recuerdo muy bien. Pero creo que son... No sé si son cuatro (4) o [sic] ocho (8) horas, anual, de vaca...
>
> P. ¿Anuales?
>
> R. ...de vacaciones. Lo que pasa es que, como no... no la he leído, así, con detenimiento, no... no voy a decir un disparate. ¿Tú me entiendes? Pero la he leído, así, por encima. Pero referente a la ley nueva, es muy diferente a la ley vieja.
>
> **P. Okey. Pero lo cierto es que, entonces, usted no sabía cuántos días iba a acumular con Kelly.**
>
> **R. No, porque era la primera vez que me habían dicho eso, "que desde... te vamos a contratar bajo la ley nueva". Era la primera vez.**
>
> P. O sea...
>
> R. Cosa que ella... me tomó de sorpresa al decirme eso. Me tomó de sorpresa.
>
> P. Exacto. La tomó de sorpresa, y usted no sabía cuánto eso podía significar en días o en horas.
>
> R. Exactamente.
>
> P. Okey. Y, por tanto, usted no sabía tampoco cómo podía variar eso con sus vacaciones o enfermedad en GVS. ¿Correcto?
>
> R. Correcto.
>
> P. Y lo cierto es, señora Rosa, que debido... que usted rechazó el acercamiento de Kelly. ¿Correcto?
>
> R. Correcto.
>
> P. Así que, usted nunca vio un contrato de empleo, ni una oferta escrita de Kelly. ¿Correcto?

R. No. Solamente el email que me envió y el mensaje de texto.[21]

Por su parte, en la deposición que se le tomó a la Apelante Isabel Montes el 13 de junio de 2024, esta expuso lo siguiente:

P. Le pregunto, ¿si usted… ehhh… que no sea suya, puede ser de algún compañero de la… que trabaja actualmente en la Planta, ha visto algún contrato o [sic] oferta de Kelly Services?

R. No.

**P. Le pregunto, ¿si alguien le ha comentado a usted cuántos días por vacaciones está acumulando bajo Kelly Services?**

**R. No.**

**P. ¿Alguien le ha comentado a usted cuántos días por enfermedad está acumulando bajo Kelly Services?**

**R. No** (Énfasis nuestro).[22]

Asimismo, en su deposición la Apelante Angelina Osorio declaró:

P. Okey. ¿Usted sabe cuáles eran los beneficios que le iba a ofrecer Kelly?

R. No. Ahí… Bueno, lo que… Aparte de lo que especifica en la… en ese email, no.

**P. Okey. O sea, que lo que usted sabe de la oferta de empleo de Kelly es lo que diga el email que usted recibió. ¿Correcto?**

**R. Exacto.**

**P. ¿No tiene más detalles adicionales?**

**R. No**.[23]

Igualmente, en la deposición que se le tomó a la Apelante Damaris Carrillo, esta manifestó:

**P. Okey. ¿Usted sabe si tenía beneficios de licencia de vacaciones, enfermedad?**

**R. No.**

**P. Okey. Entonces, ¿usted rechazó esa oferta de Kelly?**

**R. No.**

P. O sea, usted ni… ¿Usted recibió ese email y no le contestó?

R. No le contesté. Eso es correcto (Énfasis nuestro).[24]

De lo anterior se desprende que cuatro (4) de las cinco (5) Apelantes no sabían cuántas horas por concepto de licencias de

---

[21] Véase, Apéndice del Recurso, págs. 204-206.
[22] *Íd.*, pág. 226.
[23] *Íd.*, págs. 266-267.
[24] *Íd.*, pág. 320.

vacaciones y enfermedad acumularían con la oferta que le hizo la compañía Kelly. Es decir, estas Apelantes no tenían conocimiento referente a sí se le iba ofrecer una menor cantidad de licencias acumuladas. Además, cabe mencionar que la oferta de empleo no se la hizo GVS, sino que la realizó un tercero, a saber, Kelly. En cuanto la Apelante, Johanna Pérez Williams, de la prueba que obra en el expediente tampoco se desprende alguna expresión de parte de esta referente a que tenía conocimiento de que tendría una acumulación menor de licencias. Por lo tanto, determinamos que el cuarto señalamiento de error esgrimido por las Apelantes no se cometió.

En fin, tras realizar un estudio *de novo* tanto de la solicitud de sentencia sumaria, la oposición a esta, así como de los documentos anejados a estos escritos es forzoso concluir que la Querella interpuesta por las Apelantes es improcedente. GVS demostró que despidió a las Apelantes a base de una reorganización legítima de su empresa, por lo que el despido de las Apelantes fue uno justificado a tenor con el Artículo 2 (f) de la Ley Núm. 80. Asimismo, la causa de acción en daños interpuesta en la *Querella* tampoco procede pues al despido de las Apelantes ser uno justificado no cabe hablar de acción culposa o negligente por parte del patrono. De igual forma, la causa de acción contenida en la solicitud de sentencia sumaria instada por las Apelantes referente a una violación al Artículo 3 (b) de la Ley Núm. 180-1998, *supra*, tampoco procede pues la oferta de empleo que se realizó a las Apelantes no fue realizada por GVS sino por un tercero y, además, las Apelante no demostraron tener conocimiento de que dicha oferta, en efecto, le redujera la acumulación de licencias por enfermedad o vacaciones.

## IV.

Por los fundamentos antes expuestos, **confirmamos** el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones